1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10  ABDULA MAO,

11            Petitioner,              No. CIV 03-0532 DFL PAN P

12       vs.

13  EDWARD S. ALAMEIDA, et al.,

14            Respondent.          FINDINGS AND RECOMMENDATIONS

15  _____/

16            Petitioner is a state prisoner seeking a writ of habeas corpus pursuant to 28 U.S.C.

17  § 2254.  Respondents have answered.

18            Petitioner August 18, 2000, conviction of one count of attempted murder, two

19  counts of assault with a firearm and one count of participation in a criminal street gang.  See Cal.

20  Pen. Code. §§ 187, 664, 245(a)(2), 186.22(a).   The court sentenced petitioner to 41 years and 4

21  months.

22            Petitioner claims the evidence is insufficient to sustain his convictions and his

23  trial counsel was ineffective.

24  /////

25  /////

26  /////

1

FACTS[1]

2

The March 1999 shooting (count III)

3

On the evening of March 22, 1999, Michael Palmore visited a woman who lived in the apartment complex at 620 Paradise on the west side of Modesto. Palmore also lived on the west side, near the Paradise complex. Palmore and the woman "[were] close," and they were "messing around a little."

Appellant Abdula Mao arrived at the apartment while Palmore was there. Palmore recognized appellant and knew him as "Buddha." Palmore knew appellant well enough to greet him on previous occasions by saying, "'Hey, Buddha,' or something, or, 'How are you doing?'" Palmore had known appellant for about seven years, and never had any disagreements with him.

Appellant became angry that Palmore was visiting the woman, and they argued with each other. During the argument, Palmore stood while appellant sat on the couch.  As the verbal argument continued, appellant drew a concealed firearm and shot Palmore in the legs. The single shot passed through Palmore's left leg and continued into his right leg. Palmore tried to wrestle the firearm away from appellant, and they fought over the weapon. The other occupants of the apartment joined in the fight and managed to disarm appellant. Palmore limped away and escaped to another apartment in the complex, where he collapsed and asked for help.

Around 10:30 p.m., Modesto Police Officer Jason Stewart responded to an apartment at 620 Paradise on a shooting dispatch. He encountered an African-American male, later identified as Michael Palmore, sitting in an apartment. Palmore had suffered gunshot wounds to both legs. Officer Stewart found Palmore alert but uncooperative. Officer Stewart asked Palmore who shot him, and Palmore replied, "Buddha." Palmore further described the shooter as an Asian male, approximately 25 years old, wearing a red shirt, blue jeans, and a black baseball cap. Palmore said he had been in another apartment with Buddha when he drew semi-automatic pistol, and they wrestled over the weapon. Palmore stated a shot was fired during the fight, and he felt a burning sensation in his leg. Palmore stated that Buddha fed additional rounds at him as he ran out of the apartment. Officer Stewart asked Palmore to show him the location of the apartment where the shooting occurred but Palmore refused.

/////

[1]  The facts are taken from the opinion of the California Court of Appeal for the Fifth Appellate District in <u>People v. Mao</u>, No. F036471 (February 27, 2002), a copy of which was submitted with the answer May 16, 2003.

Officer Stewart testified that he had been conducting a traffic stop about one street south of 620 Paradise, for about 20 to 30 minutes, when he originally received the dispatch about the Palmore shooting. He never heard any gunshots in the area, and mentioned this to Palmore during their interview. Palmore did not respond to this statement and refused to answer any more questions. Palmore was transported by ambulance to the hospital for treatment of the leg wounds. Officer Stewart testified the Paradise apartment complex was fairly large, and the officers were unable to determine where appellant had been when he was shot. Officer Stewart did not find any evidence of a blood trail or bullet casings in the area. He was unfamiliar with anyone named "Buddha," and the police never found any suspects in the area that night.

Shortly after interviewing Palmore, Officer Stewart received a dispatch about another shooting on the west side, which was being investigated by the sheriff's department. The sheriff's department had received a dispatch about shots being fired around 7:56 p.m. at the Shirley Court apartments, about one mile away from 620 Paradise. The report stated that a male was jumped by four other males, shots were fired, and several Black males fled the area. The dispatch further stated that four Black males in their twenties were involved in the shooting. Officer Stewart believed that Palmore matched the description of the victim in the Shirley Court shooting, but never questioned Palmore about it.

Palmore testified that he decided to move away from Modesto after the March 1999 shooting incident because he was afraid. Palmore moved to Alabama with his wife and child and stayed with family members.[2] Palmore eventually moved back to the westside of Modesto.

The May 1999 fight

On the evening of May 6, 1999, Michael Palmore went to Wing's Market on H Street in Modesto, with his wife and child, to have dinner. When Palmore entered the store, he immediately observed appellant inside. Palmore told his wife and child to wait outside. Palmore confronted appellant and physically beat him. During the beating, the owner of the market became angry because Palmore was knocking over the displays. Palmore testified that appellant begged to be let go before the police arrived. The owner told them to stop and asked why they were fighting. According to the owner, Palmore replied: "[B]ecause a month ago he use a gun, shoot me twice in my feet."

---

[2] While Palmore referred to his "wife," he later clarified they weren't married and she was his common law wife, and they lived together "off and on."

3

Around 8:00 p.m., the police department received a call from the market about two subjects fighting inside the store. Officer Manuel Corona arrived at the market around 8:30 p.m. The storeowner stated that a Black male and an Asian male fought inside the store. Neither suspect was present when the police arrived.

Detective Allen Brocchini later interviewed the owner of the market. The owner selected appellant from a photographic lineup, and identified him as the individual who was beaten by Palmore.

The February 2000 shooting (counts I, II, and IV)

On February 8, 2000, Michael Palmore was with an acquaintance, Vera Tolden, in her car. Around 3:00 a.m., Palmore told Tolden to drive to the apartment complex at 620 Paradise because he was "trying to find a place to go since me and her could go up there and kick it and stuff, you know." Palmore denied they intended to use drugs. Instead, they were trying to find someplace where they could be alone. Tolden drove to the complex and parked in the side lot, and remained in the car as Palmore walked toward the buildings.

As Palmore entered the complex, he saw appellant standing around with "[w]lay more than" five associates. Appellant was wearing a blue sweatshirt with a hood. Palmore did not know the other people with appellant, but they were also wearing blue. Palmore and appellant looked at each other, and appellant shouted at him in a foreign language. Palmore became scared and immediately turned around and ran back to Tolden's car. As Palmore ran back to the car, he turned around and saw appellant and at least four of appellant's associates chasing him. Appellant was running in front of the others.

Palmore testified that appellant was holding something in his hand as he ran. Palmore believed appellant was holding a gun and pointing it at him during the chase. "I know I seen him with it, because he was the first one in front" of the others.

Tolden was sitting in the car when she heard Palmore "holler," and saw Palmore running back to the car, being chased by several people. When Palmore reached the car, he jumped in the passenger door and told Tolden to put her head down. She asked why, and he told her to just get down. As they both ducked below the windows, several shots were fired in a rapid sequence at the passenger side of the vehicle, shattering the windows. Palmore tried to look at the shooters, and saw appellant firing the gun at the car. Palmore testified there were streetlights in the parking lot, and he could see "about 85 percent" or "70 percent" of what was happening.

4

As the shooting continued, Palmore put his arms over his head, but he was hit in the right arm and forehead. Palmore told Tolden to start the car and get out of there, but she didn't move and appeared to be in shock. Palmore leaned over from the passenger side, turned on the ignition, and managed to put the car in gear. Tolden tried to steer but she wasn't moving fast enough for Palmore, and he took the wheel and hit another vehicle as he drove out of the parking lot.  Tolden testified that as they drove away, Palmore said, "'I got hit" and "'I got shot by him before.'" Tolden asked what he was talking about, and Palmore replied, "'It was the same person, Buddha, you know. I got shot by him before.'" Tolden became upset because she didn't know about the prior shooting, and "he sure wouldn't have been in my car" if she had known about Palmore's conflict with appellant.

Tolden and Palmore steered the vehicle down the street to Julie Johnson's residence on Ellen Avenue. Tolden remained in the car as Palmore knocked on the door.  No one answered, and Palmore was frightened the others might be following them. He decided to kick in the door to Johnson's house. He found Johnson, with whom he had a prior acquaintance, inside and told her to call an ambulance "because I thought . . . I was going to die."

Julie Johnson testified that she had been asleep when Michael Palmore knocked on her door at about 4:00 a.m.  Palmore had been shot in the arm and head. She gave him a towel for the wounds and called 911. She described Palmore as "erratic, really hyper, running around the house." Palmore told Johnson "that Buddha shot him, the same guy that shot him before." Palmore repeatedly said that he was dying and couldn't breathe, but Johnson thought the wounds just looked like abrasions and weren't bleeding. Palmore also said that "'[t]he lady in the car is dead. She is dead.'" Johnson went outside and found Tolden was still in the car. Johnson asked if she was okay, and Tolden replied that she was fine. Johnson opened the car door, but Tolden told her to close the door "because the light came on."

At approximately 4:11 a.m., the police received a call from a residence on Ellen  Avenue, about a mile from the Paradise apartments, that a subject had been shot in the head. Just prior to receiving the dispatch, Officer Steve Hinkley had driven down Paradise and noticed six to seven people congregating in the area. He noticed the subjects were wearing blue.

Officer Hinkley responded to Johnson's residence and contacted Palmore, who said the shooting occurred across the sbreet at the Paradise apartments, and described the location of the vehicle in the parking lot. Officer Hinkley examined Tolden's vehicle, and observed two gunshot holes in the passenger side of the front windshield. There was also a gunshot on the lower portion of the driver's side. He found some bullet fragments inside

5

the vehicle. Officer Hinkley went to the parking lot at 620 Paradise, and found several shell casings in the area where Palmore said the shooting occurred. He found both .380-caliber and .40-caliber casings and shells.

Officer Hinkley returned to Ellen Avenue and spoke with Vera Tolden. He described her as "out of it. . . . I don't know if it was shock or what, but was just not really easy to talk to or get information from." Tolden was "[b]izarre. Kind of out of it."

Officer Hinkley again spoke with Palmore, who was in obvious pain and hard to understand because he was excited from being shot. However, Palmore was "pretty cooperative" and stated that he had been shot by "a subject by the name of Buddha." Officer Hinkley asked Palmore how he knew this person, and Palmore replied that he had been shot by this person before. Palmore described the shooter as four feet eleven inches, 120 pounds, with brown hair.[3] Officer Hinkley testified that Palmore was excited and "kept saying that Buddha had shot him again, he couldn't believe it." Palmore said Buddha wore a blue sweatshirt and blue sweatpants, and there were several other people around him. Palmore further said that Buddha called out to his friends and Palmore returned to the car, and the shooting then occurred. Palmore stated that he told Tolden to drive away, and they went "across the street" to the residence on Ellen Avenue. Palmore was transported by ambulance to the hospital for treatment of his gunshot wounds.

Additional trial testimony

At trial, Palmore admitted he had been convicted of selling narcotics in Stanislaus County in 1997. We was also convicted of assault with a deadly weapon in Hayward in 1994. Palmore was asked if there was any doubt in his mind that appellant was the person who shot him on both occasions. Palmore testified: "No. Ain't no doubt at all, no."

Julie Johnson testified that she didn't see the shooting on February 8, 2000, but she previously lived in the Paradise apartments and knew appellant was known as "Buddha."

Deputy John Mercurio testified that he also responded to the dispatch on February 8, 2000, at Johnson's residence on Ellen Avenue. Just before he received the dispatch, he was at the intersection of Sutter and Rouse, about 400 to 500 yards from 620 Paradise, when he heard three shots fired fairly quickly. He received the dispatch about two minutes after he heard the shots.

---

[3] Officer Hinkley wasn't sure if Palmore gave this description while he was still at Ellen Avenue, or when Hinkley interviewed him again at the hospital.

Deputy Mercurio thought the shots sounded like they were from a nine-millimeter or a .380-caliber firearm.

Expert testimony

Detective Allen Brocchini of the Modesto Police Department testified extensively at trial about gang activity in Stanislaus County. He had been with the Modesto Police Department since 1993, and joined the department's gang unit when it was formed in1995. Be specifically investigated the Asian and Black gangs in Modesto and Stanislaus County. He had previously qualified as an expert in criminal street gangs in about 30 criminal trials in Stanislaus County Superior Court, primarily involving Asian and Black gangs.

Detective Brocchini testified the Asian Crips were "like a big umbrella" for other gangs in the west side of Modesto that were affiliated with the Crips, including the Cambodians with Attitude also known as the Crip with an Attitude (CWA), the Asian Boyz, the Modesto Hid Squad, and Devils of the North. The Asian Crips claimed the color blue, while the Asian Bloods claimed red, but these groups did not get along. There were also Black Crips and Black Bloods in Modesto, and these groups did not get along with their Asian counterparts.

There were also Asian Crips in Stockton, Los Angeles, and Fresno, including the Masters of Destruction (MOD). Detective Brocchini explained that if an Asian Crip from Fresno was in Modesto and needed help to evade arrest, that person could seek assistance from the Modesto members of the Asian Crips.

The CWA was located on the west side of Modesto and claimed blue. Detective Brocchini testified "one of their primary crimes of activity are burglaries, home invasion robberies, selling drugs, assaults." There were at least three members, and their members wore clothing which indicated their CWA affiliation, such as a hat with "C" or "A," or a "CWA" tattoo.

Detective Brocchini testified the Modesto Police Department considered an individual a gang member if two of six factors were satisfied: (1) regular association with previously identified gang members; (2) whether the individual proclaimed himself as a gang member; (3) whether the individual was identified as a gang member by two or more corroborating sources, including a police officer or probation officer; (4) the display or possession of physical evidence of gang membership, such as clothing, tattoos, drawings, or photographs; (5) use of words, phrases, or hand signs which are specifically associated with a gang; and (6) whether the individual was subject to a judicial finding of gang membership, either in superior or juvenile court.

Detective Brocchini was personally familiar with crimes committed by CWA in Stanislaus County. Detective Brocchini had investigated the case of Yath Chan, a CWA gang member, who was convicted with three or four codefendants in Stanislaus County Superior Court for home invasion robberies and gang enhancements. The robberies had been committed in August 1998. He was also familiar with Sarith Chhoeum, also known as "Slug," who was a CWA member and a codefendant in Chan's case.

Detective Brocchini testified that Michael Steven Earl, also known as "Busy," was a CWA gang member who was convicted of first degree burglary. Earl was African- American, but he was allowed to be a member of the Asian Crips. Hang Phompong and Sao Khaoone were Asian Crips, who were convicted of assault with a deadly weapon and gang enhancements.

Detective Brocchini was the chief investigating officer in the instant case. In his opinion, appellant was a member of the Asian Crips and associated with the CWA. Detective Brocchini's opinion was based on appellant's "regular association with other known Asian Crips, the clothing he has worn in the past, the hand sign photograph we found on the search warrant.  He meets three different criteria of the Modesto Police Department for me to say he is a gang member."

Detective Brocchini's opinion was also based on his previous contacts with appellant. Detective Brocchini reviewed his records and determined there were numerous contacts between appellant and himself from 1994 to the time of appellant's arrest. There were two contacts in 1994, two contacts in 1995, seven contacts in 1996, two contacts in 1997, none in 1998, four contacts in 1999, and three or four contacts in 2000.

Detective Brocchini's most recent contact with appellant occurred on February 19, 2000, when appellant was arrested for the instant offenses. Appellant was with Casal Nop, who was a "well-documented, convicted CWA gang member." During the search of appellant's residence, Brocchini recovered a photograph of appellant displaying a criminal street gang hand sign. When appellant was arrested, he was wearing a blue belt with a "G on the buckle, which stood for "'gangster'" and was gang related. In November 1999, appellant was contacted while he was with four CWA gang members. Appellant was wearing a blue beanie and black shoes with blue laces, which were gang related clothes.

On May 17, 1996, Detective Brocchini contacted appellant when he was with another gang member, and appellant was wearing a baseball cap with an "A" and a belt buckle with a "C," which stood for Asian Crips. He also contacted appellant in September 1996, when he was with a CWA gang member. At that time, appellant claimed affiliation with the Masters of Destruction

(MOD), an Asian Crip gang based in Fresno.

Detective Brocchini testified that based on his investigation of the instant case, appellant's offenses against Michael Palmore were gang related and committed in furtherance of a criminal street gang. The shooting on March 22, 1999, occurred when Palmore was visiting his female friend at the apartments on 620 Paradise in Modesto. At that time, the apartments were the stronghold of the Asian Crips, "meaning you didn't go in these unless you were an Asian Crip or they allowed you to go in there." Palmore didn't care about the Asian Crips and went there if he wanted to. In Brocchini's opinion, Palmore showed disrespect toward appellant when he stood up and argued with him, while appellant was still sitting down. "He stood over [appellant] and he wasn't afraid of him. And if that isn't responded to by a gang member immediately, that's a sign of weakness. That's how gang members make their name."

The biggest thing for a gang member is respect. That's what they talk about. It's a different kind of respect than we have. Their respect comes from fear. That means you are so afraid of me that  -- you're so scared of me that you respect me. We get our respect by being stand-up, going to work every day. ¶ But Michael Palmore stood up to him. That disrespected him. If [appellant] did not respond to it immediately, he could have been -- his gang could have responded to it, which happens at 620 Paradise quite often. When a gang member doesn't respond to disrespect, the whole gang responds.  ¶ And if he didn't respond to it, then his gang could have responded to it or  his gang could have turned on him. And so he didn't do like what most people would do. If you disrespect me, I might say something to you. They -- gang members take it to the extreme. Rather than fight it out, they will gang jump you and beat you up or they will -- pick up a pipe, like some of those predicate acts, and hit you or they will pull a gun out if they have it and shoot you. ¶ And that's just to teach you and everybody around that's watching and everybody that hears about it, talked about, everybody that reads about it. They know that you don't stand up to me, and that's why that shooting was -- that benefitted [appellant]. It raised the stature in that gang and it benefitted his gang. It showed how strong they were in that area.

In Detective Brocchini's opinion, appellant's shooting of Palmore on February 8, 2000, was similarly gang related and the result of the fight at the market in May 1999.  When Palmore encountered appellant at the market, Palmore disrespected

appellant "even more, meaning [Palmore] found him and he beat him." Appellant had to respond after he was beaten by Palmore because "retaliation is a must. That's what the gang members tell me. Retaliation is a must." The next time appellant saw Palmore, he shot him and "[t]ere was no thinking about it." Appellant yelled for his gang, pulled out his gun, chased Palmore, and shot him. This act was for the benefit of the gang because it showed CWA and the Asian Crips "that, hey, how down Buddha is for the gang. And it also showed the witnesses and the people in 620 Paradise that you don't -- you don't fool around with us. It benefitted the reputation of the Asian Crips."

Detective Brocchini testified there were frequent reports of shootings at the apartments at 620 Paradise, but "getting somebody to be a witness in 620 Paradise is like pulling nails." In many cases, officers who are patrolling in the area will hear shots fired from 620 Paradise, but many of the shootings are never reported to the police. "And from talking to the people over there, they -- people have told me that the kids know just to get on the floor when they hear the gunshots. They don't even get up out of bed anymore. They are so immuned to it." On cross-examination, Detective Brocchini admitted that an individual usually becomes a gang member by being jumped in. He conceded that he was unaware if and when appellant had been jumped in or out of the Asian Crips. However, his opinion that appellant was a member of the Asian Crips was based on his repeated and casual presence at 620 Paradise and other areas controlled by the Asian Crips.

Appellant's trial testimony.

Appellant, who was 26 years old, testified he wasn't present at 620 Paradise on the night in March 1999 when Palmore claimed to have been shot. Appellant thought he might have been in the Roselawn area: "I am probably somewhere getting high, getting drunk." Appellant testified he smoked "KJ" weed most of the time, and "KJ is like angel dust." He also used rock cocaine and PCP with marijuana, but never used heroin.

Appellant admitted that Palmore beat him at the market, but it was because appellant cheated Palmore in a drug deal and owed him money. At some point in 1999, Palmore gave $175 to appellant to purchase a quarter ounce of rock. Appellant left with the money and promised to return with the narcotics. However, appellant "pulled the same move, like -- it's called, like, crack head move or something, you know, a gang move, you know, when I took it and went to my friend's house." Appellant explained a "gang move" was when "you are trying to rip somebody off." Appellant admitted that he ripped off Palmore because he took the money and never gave him any drugs.

When Palmore saw him in the market, he approached

appellant and asked for the money. Appellant had been trying to hide from Palmore because of the drug deal, and told Palmore he had to pay someone else before he could pay Palmore. Appellant testified that Palmore got mad and beat him up because he cheated him in the deal and owed the money. Appellant testified he asked Palmore to let him go because Palmore was choking him. Appellant left the market before the police arrived because he had drugs on him, and he didn't want to get caught and sent to jail.

Appellant admitted he was at 620 Paradise on February 8, 2000, and that he was buying, selling, and using drugs that night. He saw Palmore purchase drugs from a younger person. Appellant testified that Palmore took something from that person's hand, and that person and his associates chased Palmore. Appellant walked toward the parking lot to investigate, and heard several gunshots and decided to get out of there.

Appellant testified he did not chase Palmore into the parking lot, and he was not holding a gun that night. Instead, he was holding a cane because he had torn his ligament. He was wearing a green jacket and pants, and a black baseball cap. Appellant denied wearing blue, or being with people who were wearing blue. Appellant also denied shooting at Palmore or the car, and suggested someone ask Palmore why he was at 620 Paradise that night.

Appellant admitted he was convicted of selling narcotics in Stanislaus County in1995. He was on felony probation after the conviction. He also pleaded no contest to a misdemeanor offense. He admitted that he was shot in 1995 when he was asked by some Nortenos about the gang he claimed. Appellant testified he never claimed Asian Crips or any other gang, but he just got into a fight with the Nortenos and was shot. He knew who shot him, but he told the police he didn't want to prosecute the case.

Appellant claimed he sold drugs because he had no place to stay and needed money. Appellant also admitted that he had previous contacts with Detective Brocchini when he patrolled the west side neighborhood. He felt that Brocchini harassed him in their prior contacts: ". . . I can't even walk around the block, whatever, he usually pull up and thinking I got something." Appellant conceded these contacts occurred when he was on felony probation, and he was buying and selling drugs during this period. "But you have got to remember, I did have a job --I had two jobs. I was working at two Carl's Jr.,one Carl's Jr. on Vintage Faire Mall and one Carl's Jr. on McHenry." He also had a job at Teriyaki Chicken Bowl for three months. "For somebody slow like me, not really smart, intelligent, they don't let you have a high-paying job, so I got to work at fast food."

Appellant testified he had never been jumped into a gang.

11

—

He drank and used drugs with gangs because they had the drugs, but he did not consider himself a member of a gang. Appellant claimed he didn't know who controlled 620 Paradise, but admitted that it was controlled by drug dealers from the Black, Asian, Mexican, and White gangs, including the "Crazy Mob Family" (CMF), and the "Asian Boyz" (ABZ). Appellant denied that he hung out with CWA, and testified that he hung out "with whoever got drug." Appellant denied that he carried a gun, and claimed "the only thing I carry is a cane."

On cross-examination, appellant conceded he went by the name "Buddha," and people on the street knew him by that name. However, he claimed there were "a lot of Buddha, Budda God, I am not the only Buddha out there." There were also Samoan and Black individuals who were known as "Buddha." He had known Palmore for six or seven years. Appellant also admitted he bought or sold drugs at 620 Paradise, but he hung out at other places. Appellant testified he usually stayed around the Roselawn area in Modesto. The prosecutor inquired which gang controlled Roselawn, and appellant replied: "There is Norteno, there is CWA, there is lot of other ones. . . ."

Appellant conceded there were a lot of gang members in Roselawn because of the drug trade in the area. Appellant also conceded he was arrested with Casal "Snoop" Nop, who was a CWA gang member and his friend. Appellant admitted he wore a belt with a "G on it, but it didn't mean anything: "I just had something to hold up my pants. I didn't have outside. I had my shirt over it. I didn't have it, like, tucked in where everybody could see it." Appellant admitted he knew all the CWA members because they lived in his neighborhood on the west side. He knew Michael Earl, and he also knew Phat "Kicker" Chan, who were both CWA gang members. However, appellant insisted he wasn't a gang member because he was never jumped in.

You want me to live by myself on an island? You know, I have got to know somebody there, you know. You don't check on the nice people I know, and some of the people is not gang member. You don't ask me about them. You always ask me about the gang member.

Appellant admitted that "'West'" was tattooed on his chest, but it was not a gang symbol and only represented his neighborhood. He also had a tattoo on his hand that said "Dreamer," but that was only for "testing out the tattoo machine" when he lived with his father on a ranch in Kansas. Appellant admitted the police seized a photograph in which he was throwing gang signs. Appellant claimed he was only joking in the photograph but Brocchini took it seriously. Appellant also claimed his signs in the photograph represented the west side and were "not

really gang-related. It's just the side of town," and everybody who lived there used that sign.

Appellant admitted that he once claimed affiliation with the Masters of Destruction when he spoke to Detective Brocchini, but again insisted he was only joking because Brocchini was harassing him. Appellant also admitted he had a blue hat with an "A" and a blue belt with a "C" on the buckle, but a friend gave the hat to him and the "C" stood for Cambodian or his father's name, "Chop."

Rebuttal evidence

On rebuttal, Michael Palmore testified that appellant didn't owe him any money for a drug deal, and he didn't beat up appellant because of any type of a debt. Instead, Palmore beat up appellant because appellant had shot him in the apartment.

Detective Brocchini testified that on September 25, 1996, he contacted appellant and some other Asian gang members. Brocchini asked appellant what he claimed, and appellant replied "MOD," which meant "Masters of Destruction," an Asian Crip gang in Fresno. Brocchini was unaware of any other Asian gang member who went by "Buddha." Brocchini was unfamiliar with any type of hand sign used by nongang residents of the west side.

Id.

ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

1  indistinguishable from a decision of the Supreme Court and nevertheless arrives at different

2  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

3  (2000)).

4         Under the "unreasonable application" clause of section 2254(d)(1), a federal

5  habeas court may grant the writ if the state court identifies the correct governing legal principle

6  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

7  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

8  simply because that court concludes in its independent judgment that the relevant state-court

9  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

10  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,

11  123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent

12  review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

13         The court looks to the last reasoned state court decision as the basis for the state

14  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

15  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

16  habeas court independently reviews the record to determine whether habeas corpus relief is

17  available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

18  II.  Petitioner's Claims

19  Sufficiency of the Evidence

20         Petitioner claims the evidence is insufficient to support his convictions.  A federal

21  court may grant habeas relief if, viewing the evidence in the light most favorable to the

22  prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt

23  under applicable state law.  Jackson v. Virginia, 443 U.S. 307, 324 (1979).  "Put another way, the

24  dispositive question under Jackson is 'whether the record evidence could reasonably support a

25  /////

26  /////

1   finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir.

2   2004) (quoting Jackson, 443 U.S. at 318).[4]  It is the province of the jury to "resolve conflicts in

3   the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to

4   ultimate facts." Jackson, 443 U.S. at 319.  On federal habeas, a court must review the entire

5   record and  determine "whether rational jurors could reach the conclusion that these jurors

6   reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991); Adamson v. Ricketts, 758 F.2d

7   441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc),

8   rev'd, 483 U.S. 1 (1987).

9   Count III - Assault with a Firearm (March 1999 shooting)

10          Petitioner asserts there was no evidence anyone heard gunshots, no physical

11  evidence, no motive and the only witness police located, the victim, was a convicted felon who

12  gave conflicting versions of the shooting.

13          The appellate court ruled,

14                  Appellant's argument ignores the most reliable evidence
          that a shooing occurred: Officer Stewart testified that Palmore
15        suffered gunshot wounds in both legs.  Palmore admitted that he
          fled the scene of the shooting and escaped to another apartment.
16        He was not bleeding profusely and the absence of a blood trail does
          not undermine the fact that Palmore was shot by someone.  Officer
17        Stewart and Detective Brocchini testified that 620 Paradise was a
          very large apartment complex, consisting of multiple two-story
18        units.  The officers also testified that shootings occurred so
          frequently at 620 Paradise that the residents seldom, if ever,
19        reported the incidents or were willing to testify in criminal
          proceedings.  While Palmore told Officer Stewart he was shot by
20        "Buddha," he refused to disclose the location of the apartment or
          identify the woman he was visiting at the time.  The officers could
21        not have recovered shell casings unless they knew the exact
          apartment where the shooting occurred, and Palmore was not
22        willing to fully cooperate.  The circumstances of Palmore's

23  ────────────────────

24      [4]  The Ninth Circuit Court of Appeals has declined to consider the question of whether
    the AEDPA requires an additional degree of deference to state courts' resolution of sufficiency of
25  the evidence claims.  See Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004);  Chein v.
    Shumsky, 373 F.3d 978, 983 (9th Cir. 2004).  Because petitioner's claim fails under the Jackson
26  standard this court also need not decide whether the enactment of the AEDPA altered that test for
    purposes of federal habeas proceedings.

1   shooting does not render the evidence inherently unreliable or
    unbelievable to support appellant's conviction in Count III.
2
                                *  *  *
3
4   While the jury convicted appellant of count III, assault with a
    firearm, based on this incident, it found the gang enhancement not
5   true as to that charge. The jury's finding on the gang enhancement
    is not inconsistent with the guilty verdict for count III because the
6   jury could have concluded that appellant shot Palmore based on
    their argument about the woman, a dispute that may have been
7   entirely independent of his gang affiliations.  Palmore never
    deviated from his initial statement to Officer Stewart that
8   "Buddha" shot him that day, and any conflicts in the evidence
    presented questions of fact and credibility for the jury to resolve.
9   There is overwhelming evidence to support appellant's conviction
    in count III for assault with a firearm.

10          In California, "[a]n assault is an unlawful attempt, coupled with a present ability,

11   to commit a violent injury on the person of another."  Cal. Pen. Code § 240 (West 1999).  Intent

12   may be proved by evidence that defendant willfully committed a violent act and may be proved

13   by circumstantial evidence.  People v. Colantuono, 26 Cal.Rptr.2d 908 (Cal. Sup. Ct. 1994).  A

14   person who "commits an assault upon the person of another with a firearm" is punished more

15   severely than one convicted of assault alone.  Cal. Pen. Code § 245(2) (West 1999).

16          Having reviewed the record, the court concludes that rational jurors could

17   conclude that petitioner committed assault with a firearm.  The state court's decision is not an

18   unreasonable application of clearly established federal law.

19   Counts II and III - February 2000 - attempted murder of Palmore and assault with a firearm on

20   Tolden.

21          Petitioner asserts the prosecution's evidence was "laden with inconsistencies."

22   Petition at 4.  Palmore gave differing physical descriptions of petitioner, Palmore and Tolden

23   each claimed to have driven from the scene of the shooting, and the prosecution's "explanation

24   of motive" made little sense.  Petition at 4.

25   /////

26   /////

                                16

1    The appellate court ruled:

2        Appellant's characterization of the facts ignores the actual trial testimony
3    about the February 2000 shooting.  Tolden waited in the driver's seat of her car as
     Palmore walked into the apartment complex.  When Palmore was chased into the
     parking lot, he jumped back into the front passenger seat.  Tolden was still in the
4    driver's seat, and he told her to duck down as the gunshots were fired at the car.
     Palmore also told her to take off, but she didn't move and appeared to be in shock
5    as the windows shattered around her.  Palmore testified that he leaned over from
     the passenger seat, started the ignition, and managed to drive the car out of the
6    parking lot, after hitting another parked vehicle.  Tolden similarly testified that
     she was shocked and frightened by the gunshots and the shattered windows.  She
7    tried to drive away, but testified that Palmore leaned over and took the wheel
     because she was apparently not driving quick enough for him.  The evidence is
8    not inherently inconsistent as to how Palmore and Tolden escaped from the
     parking lot.
9                                      * * *
10       Appellant's failure to immediately find Palmore does not negate the fact
     that appellant shot Palmore on the first opportunity that was presented to him,
11   after the fight at the market.  The record also infers that appellant and Palmore
     might not have been too eager to find each other, despite their alleged bravado.  In
12   their first encounter at the apartment, they argued and appellant shot Palmore.
     Palmore was frightened enough by the incident that he left the state.  When
13   Palmore happened to see appellant at the market, he made the first move and
     inflicted a serious beating.  When appellant happened to see Palmore walk into
14   620 Paradise, appellant immediately called out to his associates, pulled his gun,
     and chased Palmore through the complex.  The chase culminated in appellant
15   firing several shots into the passenger side of Tolden's car, just after Palmore had
     jumped inside.  While appellant might not have actively sought out Palmore to
16   inflict his retaliation, he did not hesitate to act once Palmore had the misfortune to
     stride through 620 Paradise while appellant and his associates where there.  Any
17   conflict in Palmore's physical description of appellant again presented questions
     of fact and credibility for the jury to resolve.

18   Direct Appeal Opinion, 22-23.

19       To prove attempted murder in California, the prosecution must prove the accused

20   (1) specific intent to kill; and (2) the commission of a direct but ineffectual act toward

21   accomplishing the intended killing.  People v. Smith, 37 Cal.4th 773 (Cal. 2005); Cal. Pen. Code

22   §§ 187, 664.  To prove assault with a firearm, the prosecution must prove an accused unlawfully

23   attempted and had present ability to violently injury another.  Cal. Pen. Code § 240 (West 1999);

24   People v. Colantuono, 26 Cal.Rptr.2d 908 (Cal. Sup. Ct. 1994).  A finding that an accused used a

25   firearm requires the court to impose a more severe punishment than for a mere assault.  Cal. Pen.

26   Code § 245(2) (West 1999); Cal. Pen. Code § 240 (West 1999)

17

Having reviewed the record, the court concludes that rational jurors could conclude that petitioner committed attempted murder against Palmore and assault with a firearm against Tolden.  The state court's decision is not contrary to or an unreasonable application of federal law.

Count IV - Active Participation in a Criminal Street Gang

Petitioner asserts there is no evidence he actively participated in a criminal street gang.

The appellate court determined:

> Contrary to appellant's arguments, there is overwhelming evidence to support appellant's conviction in count IV for violating section 186.22, subdivision (a).  Detective Brocchini was properly allowed to testify to his personal knowledge about the criminal activities of the Asian Crips and their associated groups in Modesto.  He testified to his personal knowledge of criminal convictions and gang enhancements suffered by Asian Crips and CWA members, including Yath Chan and Sarith Chhoeum, CWA members who were convicted of home invasion robberies in 1998.  He testified about the burglary conviction of Michael Steven Earl, and the convictions of Hang Phompong and Sao Khaoone for assault with a deadly weapon.  Detective Brocchini also had extensive personal knowledge of appellant's involvement with the Asian Crips, his association with the CWA and their members, including Casal Nop, the photograph of appellant flashing gang signs, his display of CWA clothing and colors, and his claim of being in MOD.  Such testimony was sufficient to establish the elements of the substantive offense defined in section 186.22, subdivision (a).  (People v. Ortiz (1997) 57 Cal.App.4th 480, 484.)  Indeed, appellant never denied the underlying basis for Detective Brocchini's expert testimony, but claimed he just happened to wear CWA clothing and colors, and merely associated with Asian Crips because he bought drugs from them.  He also admitted that he flashed a sign in the photograph, but claimed it was merely a sign that represented the west side.
>
> In order to affirm his conviction in count IV, we must ask whether, based on all of the evidence, a rational juror could have found appellant was currently an active CWA member when he committed the offenses on February 8, 2000, and knew CWA members engaged in a pattern of criminal activity.  The testimony of one expert witness, if believed, is sufficient to prove a fact. (West v. Johnson & Johnson Products, Inc., 1985_ 174 Cal.App.3d 831, 859.)  The conflict created by the testimony of appellant and Detective Brocchini presented a credibility question for the jury,

18

1   and there is overwhelming evidence to support their verdict in
2   count IV.

3   Section 186.22(a) of the California Penal Code states:

4       Any person who actively participates in any criminal street gang
        with knowledge that its members engage in or have engaged in a
5       pattern of criminal gang activity, and who willfully promotes,
        furthers, or assists in any felonious criminal conduct by members
6       of that gang, shall be punished by imprisonment in a county jail for
        a period not to exceed one year, or by imprisonment in the state
7       prison for 16 months, or two or three years.

8   The prosecution must prove the defendant (1) actively participated in a criminal street gang; (2)

9   with knowledge that its members engage, or have engaged, in a pattern of criminal activity; and

10  (3) willfully promoted, furthered, or assisted in any felonious criminal conduct by members of

11  that gang.  People v. Castenada, 97 Cal.Rptr.2d 906, 910-911 (Cal. 2000).  Participation must be

12  more than "nominal or passive."  Castenada, 97 Cal.Rptr.2d at 909.  The prosecution establishes

13  a pattern of criminal activity by proof that gang members individually or collectively committed

14  two or more of the offenses enumerated in section 186.22(e).  In re Elodio O, 56 Cal.App.4th

15  1175, 1179 (Cal. 1997).  The offenses need not have been gang-related.  People v. Gardeley, 14

16  Cal.4th 605 (Cal. 1996).  Ordinarily, expert testimony is necessary to establish a pattern of

17  criminal gang activity.  Gardeley, 14 Cal.4th at 617.

18          The court concludes that the evidence adduced at trial is sufficient for a rational

19  juror to find petitioner guilty beyond a reasonable doubt.  The state court's determination is not

20  contrary to or an unreasonable application of clearly established federal law.

21  Ineffective Assistance of Counsel

22          Petitioner asserts trial counsel was ineffective in closing argument and in cross-

23  examining Detective Brocchini.  The United States Supreme Court set forth the test for

24  demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668

25  (1984).  Petitioner has the burden of demonstrating by reference to specific acts or omissions that

26  were not the result of reasonable professional judgment that counsel's performance fell below an

19

1  objective standard of reasonableness.  Strickland, 466 U.S. at 690.   Courts "strongly presume

2  that counsel's conduct was within the wide range of reasonable assistance, and that he exercised

3  acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

4  695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

5        Petitioner also has the burden of proving prejudice.  Strickland, 466 U.S. at 693.

6  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional

7  errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable

8  probability is "a probability sufficient to undermine confidence in the outcome."  Id.; see also

9  Williams v. Taylor, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).

10 A reviewing court "need not determine whether counsel's performance was deficient before

11 examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it

12 is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . .

13 that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting

14 Strickland, 466 U.S. at 697).

15        Petitioner asserts counsel should have objected to counsel's closing argument that,

16 "I will concede, there was an attempted murder that night."  RT. 281.

17        The appellate court determined,

18        However, the decision of how to argue to the jury after the
          presentation of evidence is inherently tactical.  (People v. Freeman,
19        supra, 8 Cal.4th at p. 498.).  "Closing argument is as much an art
          as a science. . . . Counsel must establish as much credibility with
20        the jurors as possible if his effort to persuade them is to succeed."
          People v. Fairbank (1997) 16 Cal.4th 1223, 1251; People v.
21        Mayfield, (1993) 5 Cal.4th 142, 177.)  "It is within the permissible
          range of tactics for defense counsel to candidly recognize the
22        weaknesses in the defense in closing argument. [Citations.]"
          People v. Jones (1991) 53 Cal.3d 1115, 1150.)  "Reversals for
23        ineffective assistance of counsel during closing argument rarely
          occur; when they do, it is due to an argument against the client
24        which concedes guilt, withdraws a crucial defense, or relies on an
          illegal defense."  People v. Moore (1998) 201 Cal.App.3d 51, 57.)

25
          It would have strained credibility for counsel to challenge
26        the evidence that Palmore was actually shot on two separate

20

1    occasions.  There was independent testimony from the
     investigating officers that they observed the gunshot wounds
2    suffered by Palmore on these occasions.  It was also logical for
     counsel to concede the respective shootings constituted an assault
3    and an attempted murder.  The entire defense was based on
     appellant's claim that he never confronted appellant and never shot
4    him.  It would have been inconsistent for counsel to assert
     appellant was not the shooter, but argue that appellant did not
5    intend to murder Palmore when he shot him on the second
     occasion.  Counsel's defense of misidentification was consistent
6    with appellant's testimony and the defense theory of the case, and
     was a reasonable tactical decision based on the entirety of the
7    record.

8    Direct Appeal Opinion, 36-37.

9            Conceding in closing argument that there is no reasonable doubt about a client's

10   guilt would be ineffective assistance of counsel *per se.*  United States v. Swanson, 943 F.2d

11   1070, 1074 (9th Cir. 1991).

12           The prosecution presented evidence that someone chased Palmore and shot

13   multiple rounds at him in the early morning hours of February 8, 2000, at 620 Paradise.  The only

14   question was the identity of the shooter and the only evidence on this was Palmore's

15   identification of petitioner.

16           Within this framework, counsel began his closing argument, "They wanted you to

17   convict him based on the words of a lying, drug-dealing, philandering fellow."  RT. 270.

18   Counsel reviewed the evidence of Palmore's and petitioner's credibility, emphasizing the

19   discrepancy between Palmore's initial description of "Buddha" as just under five feet tall and 120

20   pounds and his later description, which more closely fits petitioner, as five feet, six inches and

21   240 pounds, and the fact that petitioner could have denied his presence at 620 Paradise but he did

22   not.  RT. 270-272, 278, 279.  Relying on the prosecution's burden to prove guilt beyond a

23   reasonable doubt counsel argued, "That is precisely what reasonable doubt is.  I don't know

24   which one is telling the truth.  That's reasonable doubt.  I don't know if he is telling the truth.

25   That's reasonable doubt."  RT. 277-278.   The crux of counsel's argument was that despite

26   evidence of the other elements of attempted murder,

1         you don't reach any of these issues in terms of the elements unless you
     decide it was [petitioner] that did it. . . . [y]ou never reach [the other
2    elements] unless you find that it was Mr. Mao that did it.  That is the first
     question.  An you can't get past that question on either count, on either
3    incident.  You have got reasonable doubt on the who did it, and there is no
     sense deliberating over whether it was gan-related or whether a gun was
4    used.  Doesn't matter if he didn't do it.  And there is plenty of doubt that
     [petitioner] did it, plenty of doubt that we have gone over already.
5

6    RT. 281-82.

7         Counsel did not concede his client's guilt.  He argued his client was not guilty

8    because his client did not shoot Palmore.  "The Sixth Amendment does not hold an attorney

9    responsible for the difficulty of the case he inherits."  Hendricks v. Calderon, 70 F.3d 1032, 1040

10   (9th Cir. 1995).  It cannot be said that counsel failed to "fulfill the role in the adversary process

11   that the [Sixth] Amendment envisions."  Strickland, 466 U.S. at 688.

12        The appellate court's decision is not contrary to or an unreasonable application of

13   clearly established federal law.

14        Petitioner asserts counsel was ineffective in his cross examination of Detective

15   Brocchini.  Petitioner asserts counsel should not have asked Detective Brocchini, "Would it be

16   fair to say that you want to see Mr. Mao convicted?" or, "What other information is there aside

17   from Mr. Palmor's statements that Mr. Mao was the shooter?"  RT. 161.  Petitioner asserts that

18   the detective's response to the latter, i.e., that other witnesses to the shooting declined to testify

19   because they were "afraid to death of Mr. Mao," prejudiced the outcome of the case.

20        The appellate court determined,

21        The conduct of cross-examination is normally a tactical
     decision left to counsel's discretion and rarely implicates
22   ineffective assistance. (People v. Bolin, supra, 18 Cal.4th at p.
     334.) The entirety of the record clearly suggests a logical tactical
23   reason for counsel's cross-examination. Defense counsel sought to
     establish Brocchini's bias against appellant, and undermine his
24   credibility as a witness, based on his active participation in the
     prosecution's actual presentation of the case. Counsel intended to
25   demonstrate that Brocchini was more than a mere disinterested
     witness, he had some type of personal stake in the outcome of the
26   /////

22

1  trial, and he was relying on Michael Palmore's statements as
   evidence of appellant's guilt.

2
3          Appellant complains that counsel's cross-examination led to
   the inadmissible hearsay testimony about Brocchini's reliance on
   other, unnamed parties and their assertions about appellant's
4  complicity. While counsel's questions were tailored to raise the
   bias issue, Brocchini's testimony unfortunately resulted in
5  inadmissible hearsay.

6          However, defense counsel objected to Brocchini's response
   and the court ordered the testimony to be stricken. It cannot be said
7  that Brocchini's unexpected reply was the result of counsel's
   ineffectiveness, given the defense's logical attempt to undermine
8  the credibility of Brocchini and his reliance on Palmore.

9  Direct Appeal at 34-35.

10         The Sixth Amendment requires counsel "to bring to bear such skill and

11 knowledge as will render the trial a reliable adversarial testing process." Strickland, 466 U.S. at

12 688.  Tactical decisions about whether to pursue a line of questions must only fall within a

13 "wide range of reasonable professional assistance," and are reasonable if they "might be

14 considered sound trial strategy." Id. at 689;  Dows v. Wood, 211 F.3d 480, 487 (9th Cir. 2000).

15         The prosecution's strongest evidence against petitioner for attempted murder and

16 assault with a deadly weapon was Palmore's eyewitness identification.  No physical evidence

17 directly connected petitioner to the shootings.  Petitioner was the only defense witness and so

18 counsel's primary strategy was vigorously to cross-examine the prosecution's witnesses.

19 Possible bias and the basis for a witness' testimony are proper lines of inquiry on cross-

20 examination.  That counsel may not have anticipated the answer to the second question does not

21 take his performance outside the range of reasonable professional assistance, especially since he

22 objected and the trial court struck the answer.

23         The trial court's decision was not contrary to or an unreasonable application of

24 clearly established federal law.

25         For the reasons stated, the court finds petitioner is not entitled to habeas corpus

26 relief.

1        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

2   writ of habeas corpus be denied.

3        These findings and recommendations are submitted to the United States District

4   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

5   days after being served with these findings and recommendations, any party may file written

6   objections with the court and serve a copy on all parties.  Such a document should be captioned

7   "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

8   within the specified time may waive the right to appeal the District Court's order.  Martinez v.

9   Ylst, 951 F.2d 1153 (9th Cir. 1991).

10  DATED:  May 17, 2006.

11

12                                          _____

13                                          UNITED STATES MAGISTRATE JUDGE

14  \004
15  \ mao0532.157

16

17

18

19

20

21

22

23

24

25

26